**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

ETHAN JAMES CHARLES,      :
     Plaintiff,      :
     :      CIVIL ACTION NO.
     v.      :      2:18-CV-0101-RWS
     :
JEFF JOHNSON, et al.,      :
     Defendants.      :

## ORDER

Presently before the Court is the Magistrate Judge's Report and Recommendation (R&R), [Doc. 66], recommending that Defendants Johnson, Thacker, and Brantley's joint motion for summary judgment, [Doc. 41], and Defendant Leckie's separate motion for summary judgment, [Doc. 42], be granted and the instant action be dismissed. Plaintiff has filed his objections in response to the R&R. [Doc. 72].

A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. United States v. Raddatz, 447 U.S. 667, 680 (1980). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the Report and Recommendation that is the subject of a proper objection on a *de novo* basis and any non-objected portion under a "clearly erroneous" standard. "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive or general objections need

not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988).

## I. Background

Plaintiff filed the instant complaint raising claims related to his July 8, 2016, arrest in Dawsonville, Georgia. Plaintiff asserts claims under § 504 of the Rehabilitation Act of 1973 against Defendant Johnson in his official capacity as Sheriff of Dawson County; excessive force claims under 42 U.S.C. § 1983 and the Georgia Constitution against Defendants Thacker, Brantley, and Leckie; state law claims of abuse against all Defendants; and state law claims of battery and intentional infliction of emotional distress against Defendants Thacker, Brantley, and Leckie.

The Magistrate Judge provided a thorough description of the undisputed material facts, [Doc. 66 at 6-11], that this Court will not repeat here. Briefly, Plaintiff was the passenger of a car that was pulled over for speeding by Defendant Thacker, a Dawson County Sheriff's deputy. Thacker collected the identification cards of all occupants of the car. Dispatch informed Thacker that Plaintiff had an outstanding warrant for a probation violation. As Thacker approached the car to inform Plaintiff that he was under arrest, Plaintiff was speaking on the telephone to his mother. Thacker told Plaintiff to exit the car and to end the telephone conversation. Plaintiff exited the car and walked over to Thacker's patrol car, but continued his phone

2

conversation. When Thacker told Plaintiff that there was an outstanding warrant for his arrest, Plaintiff had a panic attack. Thacker told Plaintiff multiple times to end his telephone conversation and to put his hands behind his back to be handcuffed. Plaintiff, however, continued his phone conversation and did not put his hands behind his back. Thacker then grabbed Plaintiff's arm, and Plaintiff actively resisted. For the next four to five minutes Plaintiff struggled against Thacker's efforts to handcuff him, during which time Plaintiff cried out continually. Thacker took Plaintiff to the ground, and Plaintiff apparently hit his head on the pavement.

Defendant Leckie, a civilian bystander, stepped in to assist Thacker, even though Thacker had not requested assistance. Defendant Brantley, another Sheriff's deputy, arrived at the scene and joined the fray, and Leckie withdrew. Brantley deployed his Taser in "drive-stun mode"[1] to subdue Plaintiff. Eventually, the two deputies were able to handcuff Plaintiff. Thacker and Brantley grabbed Plaintiff by the arms and stood Plaintiff up. As they attempted to take Plaintiff to Thacker's patrol car, Plaintiff went limp, and Thacker and Brantley dragged Plaintiff a few feet by his arms. Then Plaintiff stood up and entered the back seat of the patrol car. Once he was in the patrol car, Thacker continued to cry out, and he began to bang his head against

---

[1] Drive stun mode is a lower setting or lesser application of the Taser than the dart or probe mode. <u>Mattos v. Agarano</u>, 661 F.3d 433, 443 (9th Cir. 2011).

3

the partition between the front seat and the back seat, injuring himself enough to require a hospital visit. Thacker then drove Plaintiff to the jail and then to a hospital to treat his self-inflicted injuries. Plaintiff was convicted of felony obstruction for his actions in resisting Thacker's efforts to arrest him.

In the R&R, the Magistrate Judge determined that Defendant Johnson was entitled to summary judgment with respect to Plaintiff's Rehabilitation Act claim because his panic attacks occur too infrequently to substantially limit a major life activity and because Plaintiff failed to present sufficient evidence for a jury to determine that Defendant Thacker had substantial supervisory authority under the Act. The Magistrate Judge further concluded that Thacker and Brantley are entitled to summary judgment with regard to Plaintiff's excessive force claim because the claim is barred under the doctrine announced in Heck v. Humphrey, 512 U.S. 477 (1994), because Plaintiff's success with that claim would imply the invalidity of his obstruction conviction. The Magistrate Judge also *sua sponte* determined that Defendant Leckie is entitled to summary judgment with respect to Plaintiff's § 1983 claim because Plaintiff failed to present sufficient evidence that Leckie, a private citizen, was acting under color of law. Finally, having determined that Defendants are entitled to summary judgment with respect to all federal claims, the Magistrate Judge

recommends that this Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## II. Defendant Leckie is Entitled to Summary Judgment

In his objections, Plaintiff contends that the Magistrate Judge erred. He first argues that the Magistrate Judge should not have *sua sponte* raised the issue that Defendant Leckie is not subject to § 1983 liability as a private actor. However, according to the Eleventh Circuit,

> Ours is an adversary system. When, as here, there are two sides, each side is afforded the opportunity to argue its position. But the court is not limited to choosing one side's position or the other's. The court's role is to get it right, not to choose which side's argument is better and adopt it lock, stock, and barrel. See, e.g., United States v. Baston, 818 F.3d 651, 663 (11th Cir. 2016) (concluding that on a disputed legal issue, "[n]either party is correct," and applying the correct standard that neither party advocated); see also Colburn v. Odom, 911 F.3d 1110 (11th Cir. 2018) (resolving an appeal on a ground not addressed in either side's brief but essential to proper resolution of the dispute). Were it otherwise, there would be no plain-error doctrine.
>
> Thousands of cases could be cited illustrating this principle. Indeed, the principle is so well settled that it is rarely mentioned. When a court adopts a view of the law that is not precisely in line with either side's argument, the court usually sets out its view of the law without citing authority for the proposition that it may do so. The Supreme Court has explained it this way: "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." U.S. Nat'l Bk. of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 446 (1993) (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991)).

5

United States v. Undetermined Quantities of All Articles of Finished and In-Process Foods, 936 F.3d 1341, 1350 (11th Cir. 2019) (affirming the district court's grant of summary judgment on the basis of a entirely novel statutory construction that neither party had advocated or discussed).[2]  Despite Plaintiff's statement to the contrary, [Doc. 72 at 4 n.4], the fact that a private citizen is generally not subject to § 1983 liability is glaringly obvious.  Indeed, "acting under color of law" is a central tenet of § 1983 jurisprudence, and it is surprising that neither party addressed the issue.  As the discussion by the Eleventh Circuit quoted above indicates, the fact that no one addressed this crucial issue does not prevent this Court from doing so.  In any event, Plaintiff has not been prejudiced by the Magistrate Judge's decision to address the issue *sua sponte* as Plaintiff can address (and has addressed) the matter in his objections.  While Plaintiff contends that he did not have the opportunity to present evidence on this issue because Leckie never raised it, this Court concludes that the undisputed facts clearly demonstrate that Leckie did not act under color of law.

---

[2]  Plaintiff's reliance on Boyd v. Carroll, 624 F.2d 730, 732 (5th Cir. 1980), is misplaced.  In Boyd the old Fifth Circuit held that a Defendant could not raise an affirmative defense for the first time in a motion for directed verdict.  As the court noted, an affirmative defense is subject to waiver.  In this case, the issue—whether Leckie acted under color of law—is not an affirmative defense but a basic element of a § 1983 claim.

6

Turning to Plaintiff's argument that Leckie did act under color of law, he contends that all he has to show is "joint action" with state agents to impose § 1983 liability on Defendant Leckie. It is clear from a comprehensive review of the case law, however, that more than mere joint action must be demonstrated. In Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001), which the Magistrate Judge relied on, the Eleventh Circuit stated that

> to hold that private parties . . . are State actors, this court must conclude that one of the following three conditions is met: (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[]" ("nexus/joint action test").

Id. (citation omitted).[3]

Plaintiff apparently contends that he has met the "nexus/joint action test" which is the test discussed in Dennis v. Sparks, 449 U.S. 24, 27 (1980), upon which Plaintiff relies. However, that test contemplates that the private actor and the state actor

---

[3] A few years after Rayburn, the Eleventh Circuit provided another formulation: "[a] private citizen . . . cannot be liable under section 1983 unless he is shown to have conspired with one or more state actors." McBrearty v. Koji, 348 Fed. Appx. 437, 439 (11th Cir. 2009) (citing Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1283 (11th Cir.2002)). As discussed below, a conspiracy is part of the nexus/joint action test discussed in Rayburn.

AO 72A
(Rev.8/82)

engage in a conspiracy to violate the rights of another. See United States v. Price, 383 U.S. 787, 798 (1966). "[T]he acts of a private party are fairly attributable to the state on certain occasions when the private party acted in concert with state actors." Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990) (citation omitted). In order to establish a § 1983 conspiracy, a plaintiff must show that the defendants "reached an understanding to violate [his] rights." Id. at 1283 (citation omitted). While a plaintiff need not come forward with a "smoking gun" to show an understanding, he must "show some evidence of agreement between the defendants" and willful participation. Id. (citation omitted). "The linchpin for conspiracy is agreement, which presupposes communication." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., 956 F.2d 1112, 1122 (11th Cir. 1992). Here, there is no evidence of an agreement between Thacker and Leckie. Leckie believed that Thacker needed help, and he helped.

While it could be said that, for a few minutes, Leckie and Thacker worked in concert to try to restrain Plaintiff, this Court concludes that, in this case, the facts are not sufficient to establish that a conspiracy existed. "Action taken by private entities with the mere approval or acquiescence of the State is not state action." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999). As the record shows, Thacker never asked for Leckie's assistance, thus no conspiracy existed.

8

"The determination of whether there is sufficient state action by nonstate persons to sustain a § 1983 claim must be made on a case by case basis," Bailey v. McCann, 550 F.2d 1016, 1018 (5th Cir. 1977), and the facts of this case are qualitatively different from the civil rights era cases—in which private citizens joined state officials to deny the rights of minorities —upon which Plaintiff relies.

This case is much more akin to a Seventh Circuit case, Proffitt v. Ridgway, 279 F.3d 503 (7th Cir. 2002), in which a police officer was attempting to subdue Woodall, whom the officer had arrested. Lykins, a private citizen bystander, stepped in to assist the officer after the officer requested help. Lykins ended up inadvertently killing Woodall by applying too much pressure to Woodall's neck with his forearm. In determining that Lykins was not a state actor under § 1983, Judge Richard Posner, writing for the court, held:

> we do not think that the rendering of brief, ad hoc assistance to a public officer transforms a bystander into a state actor, exposing him to liability under federal law and, by doing so, discouraging people from helping the police. We cannot find a case on point but common sense and analogy carry the day. To assist the police is a duty of citizenship; and the performance of a duty to someone does not turn the performer into that someone. A private citizen does not become a policeman by complaining to a policeman, Hughes v. Meyer, 880 F.2d 967, 972 (7th Cir. 1989); Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 435-36 (7th Cir. 1986); Steele v. City of Bemidji, 257 F.3d 902, 906 (8th Cir. 2001); Redding v. St. Eward, 241 F.3d 530, 532-33 (6th Cir. 2001); Cruz v. Donnelly, 727 F.2d 79, 79-80, 82 (3d Cir. 1984) (per curiam), nor (the novel situation presented by this case) by responding to a policeman's

request for assistance, unless the request is for such extensive aid that by acceding to the request and rendering the aid the private citizen must realize that he has become a temporary public officer. The line is vague, of course, but was not crossed here. So summary judgment was rightly granted for Lykins.

Proffitt v. Ridgway, 279 F.3d 503, 508 (7th Cir. 2002).

This Court adopts the Seventh Circuit's analysis and concludes that Leckie is likewise entitled to summary judgment with respect to Plaintiff's § 1983 claim.

## III. *Heck v. Humphrey* **and Qualified Immunity**

Plaintiff next objects to the Magistrate Judge's determination that his § 1983 claims against Thacker and Brantley are barred by Heck. However, this Court generally concludes that the Magistrate Judge was correct to rely on the Eleventh Circuit's discussion in Sconiers v. Lockhart, 946 F.3d 1256, 1268-70 (11th Cir. 2020), to determine that Plaintiff's § 1983 claim is Heck-barred. As the Magistrate Judge found, Plaintiff claims that Defendants used excessive force four times: (1) in the initial encounter between Thacker and Plaintiff when Thacker took Plaintiff to the ground, (2) in the struggle on the ground between Plaintiff, Thacker, and Leckie, (3) when Brantley tased Plaintiff, and (4) when Defendants Thacker and Brantley dragged Plaintiff to Defendant Thacker's patrol car. [Doc. 44 at 3, 7-13, 19-24]. As is discussed in much more detail below, from a review of the video recordings of the events of that night, it is clear that Plaintiff was actively resisting arrest during each

of those four occurrences. As a result, it is clear that Thacker's and Brantley's "use of force was necessarily responsive to" Plaintiff's active resistance to his arrest. Sconiers, 946 F.3d at 1269. As such, a finding by this Court that Thacker and Brantley used excessive force would imply the invalidity of his conviction for felony obstruction.

Moreover, as Defendants point out in their response to Plaintiff's objections, [Doc. 74], the indictment to which Plaintiff pled guilty accused that Plaintiff "did unlawfully knowingly and willfully resist and oppose Deputy William Thacker, a law enforcement officer *in the lawful discharge of his official duties . . . .*" [Doc. 41-4 at 2 (emphasis added)]. The Georgia statute that criminalizes obstruction states that "[w]hoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer *. . . in the lawful discharge of his or her official duties . . .* shall be guilty of a felony . . . ." O.C.G.A. § 16-10-24 (emphasis added). According to the Georgia courts, the lawful discharge of an officer's duties is an essential element of the crime of felony obstruction that must be proven by the state. Horton v. State, 828 S.E.2d 150, 152 (Ga. Ct. App. 2019). As noted above, Plaintiff actively resisted arrest during the time that he claims that Thacker and Brantley used excessive force against him, and a finding by this Court that the officers used excessive force against Plaintiff

AO 72A
(Rev.8/82)

would imply the invalidity of the state court's criminal judgment against Plaintiff that the officers were engaged in the lawful discharge of their duties.

This Court acknowledges Plaintiff's argument that, even if he was resisting, the officers could have nonetheless applied force that was excessive to what was required, but that did not happen in this case. Therefore, this Court holds in the alternative that Thacker and Brantley are entitled to summary judgment on the basis of qualified immunity.[4] This Court has carefully reviewed the record in this case which includes two video-audio recordings taken from the "dash-cams" on Defendants Thacker's and Brantley's patrol cars. See Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that in summary judgment review, the court need not accept Plaintiff's version of events where that version "is blatantly contradicted by the record [as by a video recording of the event at issue] so that no reasonable jury could believe it"). Those videos clearly establish that Thacker and Brantley acted reasonably in attempting to legally restrain Plaintiff while Plaintiff became increasingly agitated. Indeed, no jury having watched those videos could reasonably find that Defendants violated Plaintiff's federal rights.

---

[4] Having determined that Plaintiff's claims are Heck-barred, the Magistrate Judge opted not to review Thacker's and Brantley's claim of qualified immunity.

Under <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), this Court conducts a two-part inquiry to determine whether Thacker and Brantley are entitled to qualified immunity.[5] <u>Id.</u> at 200. First, this Court determines if the facts, taken in the light most favorable to Plaintiff, show that Thacker's and Brantley's conduct violated Plaintiff's Fourth Amendment rights. <u>Id.</u> at 201. Second, if a reasonable jury could find that Plaintiff's constitutional rights were violated under the facts alleged, this Court must determine whether Plaintiff's rights were clearly established—that is, whether it would have been clear to a reasonable officer that Thacker's and Brantley's conduct was unlawful. <u>Id.</u> at 202.

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). In the context of an excessive force claim, "qualified immunity

---

[5] In <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), the Supreme Court held that the two-step <u>Saucier</u> protocol is not mandatory but recognized "that it is often beneficial."

13

applies unless application of the standard would inevitably lead every reasonable officer . . . to conclude the force was unlawful." Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993); accord Corbitt v. Vickers, 929 F.3d 1304, 1322 (11th Cir. 2019).

On the video from Thacker's patrol car, it is clear that Plaintiff first failed to comply with Thacker's directions at six minutes and forty-one seconds into the video. Then, at 7:22, Thacker attempted to gain physical control of Plaintiff, and Plaintiff began to physically resist. Plaintiff continued to actively and physically resist for approximately four minutes before Brantely employed his Taser to subdue Plaintiff, and this was after Thacker and Brantley warned Plaintiff at least eight times that he would be "tased" if he did not comply with their instructions. During the entire struggle, Plaintiff screamed and falsely claimed that he was not resisting. At one point Plaintiff falsely claimed that one of the officers hit him in the face. It is thus clear that both officers demonstrated restraint in an earnest effort to arrest Plaintiff.

Given the circumstances, the fact that Thacker took Plaintiff to the ground, or tackled Plaintiff, and continued to struggle with Plaintiff while they were on the ground, was not excessive—or put another way, not "every reasonable officer in [Thacker's] position would conclude the force was unlawful," Post, 7 F.3d at 1559, because it is clear that Thacker was applying only the force necessary to place Plaintiff

14

under arrest and nothing more.  Nor would every reasonable officer conclude that, after struggling with Plaintiff for several minutes and warning him repeatedly, it was unlawful for Brantley to deploy his Taser.

Once Plaintiff was handcuffed, the officers stood Plaintiff up and led him to a patrol car.  Plaintiff went limp, and the officers continued to drag him for a few feet but then paused and told Plaintiff to stand up.  He stood up, and the officers placed Plaintiff in the patrol car.  It is thus entirely clear that Thacker's and Brantley's dragging of Plaintiff was not unlawful.  They were holding him by his upper arms and were not dragging him, for example, by his handcuffs, his shirt, or his hair.

Significant to this Court's qualified immunity determination is the fact that after Plaintiff was handcuffed, the officers stopped struggling with Plaintiff and merely used reasonable means to place Plaintiff in the patrol car.  Put another way, once Plaintiff stopped resisting, the officers no longer applied force.

That Plaintiff suffers from panic attacks—and experienced such an attack during his arrest—is an unfortunate adjunct to this case, but it adds nothing to Defendants' civil culpability under § 1983.  Thacker was informed that there was a warrant for Plaintiff's arrest, and Thacker's duty was to arrest Plaintiff.  Plaintiff actively resisted arrest, and Thacker used reasonable means to restrain Plaintiff.  There is further no evidence that either officer beat, kicked, or struck Plaintiff in any manner.

AO 72A
(Rev.8/82)

The case law further bolsters Thacker's and Brantley's entitlement to qualified immunity. Notably, in <u>Hoyt v. Cooks</u>, 672 F.3d 972, 974 (11th Cir. 2012), the Eleventh Circuit determined that Bacon County Deputy Bernard Cooks and Alma Police Officer Randy Harkleroad were entitled to qualified immunity with respect to their application of force to arrest a resisting James Christopher Allen under the following facts:

> At around 2:02 a.m. on May 9, 2007, Cooks was driving his patrol car in Alma, Georgia, when he received word from dispatch that Allen had called 911 three times from his residence. Allen told the dispatcher that he was being sewn up in a suit and that demons were trying to get him.
>
> At around 2:16 a.m., Cooks arrived at Allen's residence, drove up the driveway, and rolled down his car's front driver-side window. While screaming that demons were trying to get him, Allen ran out of the house towards the patrol car and yelled that Cooks was a demon who needed to be killed. Allen then lunged into Cooks's patrol car through the open window and grabbed at Cooks's shirt. Cooks pushed Allen away and moved the patrol car forward to dislodge him.
>
> Cooks exited his patrol car and asked Allen what he was doing. Allen repeated that demons were trying to get him and that Cooks was a demon. Cooks unholstered his model X26 Taser. Allen began crawling towards Cooks, who retreated to his patrol car and called for assistance at around 2:17 a.m. Allen continued to crawl towards Cooks, who told Allen to lie down and be still. Allen obeyed and lay down.
>
> While waiting for backup to arrive, Cooks had his Taser drawn and made no effort to arrest Allen, who would occasionally try to get up but would lie down again when Cooks ordered him to do so. Harkleroad, who had been deputized to assist Bacon County sheriffs, arrived as back-up at around 2:27 a.m. At that point, Cooks holstered his Taser, which had not

16

yet been activated, and told Harkleroad that Allen needed to be handcuffed and taken to jail.

Cooks repeatedly ordered Allen, who was still lying on the ground, to place his hands behind his back. However, Allen would place just his one hand behind his back while keeping the other hand outstretched. Harkleroad got on his knees and tried to grab Allen's arms, but Allen continued to resist and would not allow both arms to be put behind his back.

Due to the difficulty in trying to handcuff Allen, Cooks unholstered his Taser, shot a set of flying probes into Allen's lower back, and discharged the device. The officers again ordered Allen to put both arms behind his back, but he still kept his arms outstretched, refusing to let the officers handcuff him. Cooks then used the Taser against Allen's leg in "dry stun mode,"[6] where the device was pressed directly against Allen's skin to produce a burning sensation. Both officers were on their knees during their attempts to handcuff Allen, but he continued to roll around on the ground and refused to let the officers grab his arms and handcuff them. After several dry stuns, the officers were able to get handcuffs on one of Allen's hands but were unable to handcuff both hands.

Allen continued to struggle and to ignore the officers' commands. Unable to get Allen to comply, Cooks again used his Taser in dry stun mode on Allen's leg. As Cooks tried to complete the handcuffing, Harkleroad unholstered his model M26 Taser and applied several additional dry stuns to Allen. During the entire sequence, the officers repeatedly ordered Allen to put his arms behind his back and tried to complete the arrest. Cooks and Harkleroad decided that their stuns were not having the desired effect, and the officers ceased using the Tasers. Cooks was then able to get Allen's other hand handcuffed by physical force.

Allen asked why he was handcuffed, to which Cooks responded that Allen was under arrest for felony obstruction. Allen stated that he did

_____

[6] It is clear that the Eleventh Circuit means "drive-stun mode."

AO 72A
(Rev.8/82)

not want to go to jail.  He refused to walk, so Cooks and Harkleroad carried him to Cooks's car.  The officers searched Allen and found no weapons or drugs.  Allen was placed in the back seat of Cooks's patrol car, and Cooks secured Allen's residence.

With Harkleroad following in his own patrol car, Cooks and Allen departed the scene en route to the Bacon County Sheriff's Office at around 2:41 a.m.  During the trip, Allen asked how much longer until they arrived, to which Cooks replied that it would be a few more minutes.  Upon arrival at the Sheriff's Office, Allen did not respond when Cooks tried to rouse him.  Harkleroad retrieved ammonia capsules from a nearby EMT, but these also had no effect.  Cooks pulled Allen from the car and found no pulse.  CPR was performed, and Allen was then placed in an ambulance and taken to Bacon County Hospital, but he was pronounced dead upon arrival.  The cause of death was listed as "cocaine-induced excited delirium in a background of coronary atherosclerotic disease."

Cooks said that he had stunned Allen once with the probes and two times in dry stun mode, although his Taser data download showed that the device had been activated twelve times.  Harkleroad said that he had stunned Allen three times in dry stun mode, but his Taser's data download showed that it had been activated six times.  The record shows that an "activation" of the Taser does not mean that the Taser actually touched or stunned Allen.  In any event, the more significant fact is that Allen was tased only once in the prong mode, and that all subsequent tasings were in the dry stun mode.

Cooks stated that Allen had drug problems for the last twelve or thirteen years.  Cooks had been called to Allen's residence eight or nine times in the past, usually in the early morning hours when Allen would call 911 and say that he was seeing demons or was being assaulted.  During past encounters, Allen had been verbally aggressive towards Cooks but had never been physically aggressive.

Id. at 974-76.

AO 72A
(Rev.8/82)

In determining that the force used by Cooks and Harkleroad was "not so excessive as to rise to the level of obvious clarity," the Eleventh Circuit noted that "Allen resisted during the entire time that Cooks and Harkleroad tried to handcuff him. He spread his arms apart to prevent being handcuffed, and he rolled around to keep his arms from being pulled behind his back.[7] Even after repeatedly using their Tasers, Cooks and Harkleroad had considerable difficulty in effecting the arrest." Id. at 979. The Eleventh Circuit further noted that strong government interests were at stake because "Cooks and Harkleroad could not wait indefinitely for Allen to stop resisting or for his strange behavior to subside. Allen could not be safely transported until he was restrained." Accordingly, the Eleventh Circuit concluded that given these factors, Cooks and Harkleroad were entitled to qualified immunity because their conduct would not "require all reasonable officers to inevitably conclude that the force used was unlawful." Id. at 980.

Plaintiff attempts to distinguish Hoyt by noting that Allen had committed an assault and battery on Cooks by grabbing his shirt and had threatened to kill Cooks. However, under the facts assumed by the Eleventh Circuit, Cooks knew Allen (had

---

[7] Plaintiff contends that Allen's spreading his arms and rolling around to prevent being handcuffed distinguishes that case. It is clear from the video, however, that Plaintiff likewise resisted being handcuffed by refusing to lower the phone from his ear and turning away from Thacker. This Court finds no material difference between the two behaviors.

interacted with Allen "eight or nine times in the past") and knew he was not likely to be physically aggressive. Moreover, by the time that Cooks and Harkleroad deployed their tasers, Allen was not assaulting or threatening either officer; he was simply resisting the officers' efforts to place him in handcuffs.

Given the similarity of the facts of <u>Hoyt</u> and this case, and noting that in this case the police were much more restrained, this Court must likewise conclude that Thacker and Brantley are entitled to summary judgment on the basis of qualified immunity.

## IV. Rehabilitation Act

Plaintiff further objects to the Magistrate Judge's determination that Defendant Johnson is entitled to summary judgment with respect to his Rehabilitation Act claim. Having reviewed the record, this Court concludes that, under the facts, Plaintiff's Rehabilitation Act claim fails. Section 504 of the Rehabilitation Act provides that no disabled individual shall, "by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

At the outset, this Court notes that as soon as Thacker learned that Plaintiff had an outstanding probation violation warrant, Thacker had probable cause (as well as

a duty) to arrest Plaintiff. The arrest was based on the probation violation and not Plaintiff's purported disability.

Plaintiff now contends that Thacker should have accommodated him by either allowing him to talk to his mother for a "brief" while longer or by asking to talk to Plaintiff's mother himself, "and together they could have resolved the matter reasonably under the circumstances." [Doc. 45 at 13]. Instead, according to the video, Thacker offered the accommodation that "we're going to work this out [confirm the probation warrant] and we'll call her back in just a second" and moments later "let's take care of this, and I'll let you call her back." See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997) ("Stated plainly, under the ADA[8] a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation.") (quotation omitted). Plaintiff did not respond to Thacker's proposed accommodation. Instead, he became increasingly agitated.

In Bircoll v. Miami-Dade County, 480 F.3d 1072 (11th Cir. 2007), the Eleventh Circuit noted that in Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit held that the Americans with Disabilities Act ("ADA") "does not apply to an

---

[8] Because the two acts are governed by the same standards, ADA cases serve as precedent Rehabilitation Act cases and vice-versa. Cash v. Smith, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000).

officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." Id. at 801. In the Eleventh Circuit's view, however,

> the question is not so much one of the applicability of the ADA . . . The exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification . . . . [T]he question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety. . . . What is reasonable must be decided case-by-case based on numerous factors.

Bircoll, 480 F.3d at 1085-86.

In applying that test, the Eleventh Circuit determined that providing an oral interpreter for a deaf motorist suspected of driving under the influence is not a reasonable modification of police procedures "given the exigent circumstances of a DUI stop on the side of a highway, the on-the-spot judgment required of police, and the serious public safety concerns in DUI criminal activity." Id. at 1086.

In this case, Plaintiff was behaving erratically and was not responding to Thacker's efforts to calm him down.[9] Under those circumstances, this Court has

---

[9] In addition to twice offering Plaintiff the opportunity to call his mother later, Thacker also repeatedly assured Plaintiff that they would confirm the warrant and "work out" the situation.

22

significant doubt regarding the efficacy of the accommodations that Plaintiff now contends Thacker should have offered.

In his deposition, Plaintiff stated that the way he deals with a panic attack is to "just leave the situation . . . . Usually, I just try to avoid the situation that's causing the situation. . . . I try to walk off and leave it or I get in a the car and try to get to somewhere else. But sometimes I can't, I can't even do that. I usually just sit down and try to sit by myself and everybody leave me alone." [Doc. 36 at transcript page 37]. While he also testified that his mother is his "tool . . . to calm me down to take the anxiety away," [id.], this Court is not at all convinced that allowing Plaintiff to "briefly" continue talking to his mother would have made much of a difference, and this Court has the luxury of hindsight as well as the benefit of Plaintiff's testimony when he is rational. Accordingly, it would be unreasonable to weigh Thacker with the on-the-spot duty to provide an accommodation of such dubious value, especially when Thacker had no reason to know that Plaintiff's mother would be effective in calming him down. The failure to implement an ineffective accommodation is not a violation of the Rehabilitation Act. See Southeast Cmty. Coll. v. Davis, 442 U.S. 397, 409-10 (1979).

Given Plaintiff's behavior, it is equally unclear whether Plaintiff would have even responded if Thacker had offered to speak to Plaintiff's mother. Further, with

AO 72A
(Rev.8/82)

the real possibility that Plaintiff, who was admittedly panicking, might bolt, probably the most reasonable accommodation was the one that Thacker offered—allowing Plaintiff to speak to his mother after he had been secured.

Considering the particular circumstances of this case, this Court concludes that Plaintiff's proposed accommodation was not a reasonable modification of police procedure. Plaintiff was subject to arrest, and Thacker was duty-bound to effect that arrest. Given the exigent circumstance that Plaintiff might attempt to flee and the fact that there is absolutely no evidence that Thacker had the slightest suspicion Plaintiff's proposed accommodations would have made any significant difference, Thacker had no duty under the Rehabilitation Act to attempt those accommodations. Defendant Johnson is thus entitled to summary judgment with respect to Plaintiff's Rehabilitation Act claim.

## V. Conclusion

Accordingly, for the reasons stated above, the R&R, [Doc. 66], as supplemented herein, is hereby **ADOPTED** as the order of this Court, and Defendants' motions for summary judgment, [Docs. 41, 42], are **GRANTED IN PART**. Summary judgment is **GRANTED** in favor of Defendant Johnson with respect to Plaintiff's Rehabilitation Act claim and in favor of Defendants Leckie, Thacker and Brantley with respect to Plaintiff's § 1983 excessive-force claims, and those claims are **DISMISSED** with

24

prejudice.  Because this Court has now dismissed all of Plaintiff's federal claims, this Court further **DECLINES** to exercised supplemental jurisdiction over the remaining state-law claims and those claims are hereby **DISMISSED** without prejudice.

All claims having been dismissed, the Clerk is **DIRECTED** to **CLOSE** this action.

**IT IS SO ORDERED**, this 28th day of May, 2020.

_____
**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)